IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAYNE MARIE HORN, | ) | Case No. 1:25-cv-00713-BYP |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.  Introduction

Plaintiff, Rayne Marie Horn ("Horn"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Horn's application for SSI be affirmed.

## II.  Procedural History

Horn received SSI benefits based on a determination that she was disabled as a child, and on January 5, 2022, underwent a disability redetermination once she attained the age of 18. (Tr. 109-13). The claims were denied initially and on reconsideration. (Tr. 82, 88-94). She then requested a hearing before an ALJ. (Tr. 131). Horn, represented by counsel, and a vocational

expert ("VE") testified before the ALJ on March 27, 2023. (Tr. 61-70). On January 29, 2024, the ALJ issued a written decision finding Horn not disabled. (Tr. 17-34). The Appeals Council denied her request for review on February 11, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Horn timely filed this action on April 9, 2025. (ECF Doc. 1).

## III.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Horn was 18 years old at the time of her disability redetermination, making her a younger individual according to Agency regulations. (*See* Tr. 33). She has a limited education. (*See id.*). She has no past relevant work experience. (*Id.*).

### B.  Relevant Medical Evidence[1]

#### 1.  Chrysalis Health

Before turning 18, Horn treated at Chrysalis Health from November 24, 2015, through her discharge on September 20, 2016. (Tr. 576-83). These records indicate that Horn was diagnosed with attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD"). (Tr. 571). At discharge, Horn was recommended to continue volunteering at the public library and the clinician stated Horn needed socialization with other youth. (Tr. 581). Treatment notes from this period indicate that Horn "identif[ied], learned, and demonstrated interpersonal relationships and personal barriers" as well as healthy hygiene skills. (*Id.*).

---

[1] Horn only raises error with the ALJ's consideration of her mental health limitations in forming the RFC. (*See* ECF Doc. 8, pp. 15-22). All other issues are deemed waived. *See Swain v. Comm'r of Soc. Sec.,* 379 F. App'x 512, 517 (6th Cir. 2010) (affirming a district court's finding that a claimant waived arguments that he did not raise in his merits brief). I therefore only provide a review of the relevant mental health evidence.

## 2.    Enrique J Ortiz Guzman, M.D.

Also before turning 18, on August 27, 2020, Horn presented for an appointment to establish care with Enrique J Ortiz Guzman, M.D. (Tr. 510, 565). Horn's past medical history listed diagnoses of depression, anxiety, ADHD, and bipolar 1 disorder. (*Id.*). Upon a depression screening where Horn reported little interest in doing things, feeling down, trouble falling or staying asleep, feeling tired or little energy, poor appetite or overeating, feeling bad about herself, trouble concentrating, being fidgety, and thoughts that she would be better dead or hurting herself, Dr. Guzman noted his impression of moderately severe depression. (*Id.*). Dr. Guzman refilled Zoloft, 50mg to be taken once daily. (Tr. 511). He also refilled Adderall XR 10 mg for ADHD, and Vistaril 25 mg for anxiety as needed. (Tr. 513). Horn presented for follow up appointments to refill her prescriptions on November 2, 2020, December 2, 2020, December 31, 2020, January 29, 2021, February 26, 2021, March 26, 2021, April 27, 2021, May 27, 2021, June 25, 2021, July 26, 2021, August 30, 2021, September 30, 2021, October 29, 2021, November 29, 2021, December 29, 2021, and January 3, 2022. (Tr. 481, 484, 486, 488, 490, 492, 494, 496, 500, 503, 522, 525, 527, 532, 534, 536). Horn arrived independently for several of these appointments. (Tr. 481, 484, 486, 488, 490, 494, 496, 536).

At a December 31, 2020 appointment with Dr. Guzman for an Adderall refill, treatment records note that Horn denied depressed mood, difficulty sleeping, nervous breakdown, psychiatric condition, stressors, and anxiety. (Tr. 499). Depression screenings at the July 26, 2021 and November 22, 2021 appointments revealed a score of zero with Horn reporting no feeling of little interest or pleasure in doing things, or feeling down, depressed, or hopeless. (Tr. 481, 530).

3

### 3.      The Nord Center

While still a minor, Horn treated at The Nord Center with individual counseling and psychiatric services from October 28, 2019, until discharge on June 24, 2020. (Tr. 781). Her diagnoses were ADHD, moderate; oppositional defiant disorder, moderate; and major depressive disorder, moderate, single episode. (*Id.*). At discharge, Horn had improved her ability to manage anger and emotions. (*Id.*).

After reengaging with The Nord Center as an adult, Horn reported during a May 22, 2023 initial assessment that she had no limitations of activities of daily living, but expressed difficulty falling or remaining asleep, excessive sleep, nightmares, depressed mood, feelings of worthlessness/ guilt, anhedonia/loss of interest, low self-esteem, fatigue. (Tr. 772). Horn also reported anxiety symptoms including worry, phobia/excessive fear, muscle tension, separation/attachment, and social anxiety. (Tr. 773). She also acknowledged having panic symptoms including palpitations, nausea or abdominal issues, fear of losing control, choking feelings, numbness/tingling, chest pain, and derealization. (*Id.*). She endorsed past experiences of abuse. (*Id.*). Regarding traumatic stress, Horn reported intrusive symptoms, negative alterations in arousal and reactivity, avoidance, and negative alterations in cognition and mood. (Tr. 774). For attention/concentration, Horn endorsed missing details, avoiding tasks that require sustained effort, her mind being elsewhere, difficulty organizing tasks, and being easily distracted. (*Id.*). There were no reported symptoms of anger and aggression, oppositional behavior, impulsivity/mania, disturbed reality, or other addictive/compulsive behaviors. (Tr. 774-75).

Horn's speech, communication, behavior, and memory were noted as normal, and her mood and thought/content/perceptions were unremarkable. (Tr. 775). She was oriented to person, place, and time, demonstrated good insight, primarily appropriate affect, and was neat/clean in

general appearance. (Tr. 775-76). Her diagnoses at this assessment were listed as major depressive disorder, recurrent, moderate; dissociative and conversion disorder, unspecified; and PTSD, acute. (Tr. 777). The clinician assessing Horn noted that she met most of the criteria for dissociative identity disorder because she reported having a system of different identities that are like a co-pilot system, with some identities presenting when having a trauma response. (Tr. 779). Horn expressed an interest in being tested for autism spectrum disorder. (*Id.*). Horn was recommended for outpatient psychiatry services, early serious mental illness treatment, and therapeutic behavioral services, supported by care coordination. (Tr. 780).

Horn attended psychotherapy and counseling sessions at The Nord Center with Willam Mount, LPC. (Tr. 698, 714, 764, 768). Her diagnoses for these sessions were major depressive disorder, recurrent episodes, moderate; ADHD, combined presentation; PTSD; generalized anxiety disorder; bipolar disorder, current episode manic without psychotic features, unspecified; and autism spectrum disorder. (Tr. 698). At a September 25, 2023 session, Horn presented as cooperative, with tangible thought process, and irritable with full affect. (*Id.*). Horn reported interpersonal conflicts with school officials, community resource officials, and work peers. (Tr. 700). She claimed she would rather not interact with them if she did not have to. (*Id.*).

Horn's Individual Service Plan at the Nord Center noted that she reported a reduction in symptoms. (Tr. 716, 756, 761, 765). On September 7, her listed needs were medication, mental health, interpersonal skills, and moods/emotions. (Tr. 716).

At the Nord Center, Horn also treated with Mackenzie Ice, CNP, for adult psychiatry. (Tr. 701). At her initial consult for adult psychiatry, Horn reported her presenting problems as needing medications, someone to talk to, and help "figuring things out." (Tr. 745; *see also* Tr. 769 reporting the same needs). Her prescriptions included Zoloft 25mg, Vistaril 25 mg as

5

needed, Vyvanse 60 mg, and Adderall 10 mg immediate release. (*Id.*). Horn presented as anxious, and possibly manic with disorganized, racing, and circumstantial thoughts and was difficult to redirect. (*Id.*). She reported worsening depression and anxiety that "never leave." (*Id.*).

Horn presented for medication follow up appointments on July 20, 2023, August 18, 2023, and September 15, 2023. (Tr. 701, 723, 734). Horn was started on Abilify 5 mg for moods/depression and increased HXZ to 50 mg at bedtime on June 21, 2023. Horn was started on Mydayis 25 mg for ADHD on July 20, 2023. (Tr. 740).

At various medication appointments, CNP Ice noted consistent reports from Horn. For example, Horn reported mood stable symptoms and denied depression or mania as well as major issues with anxiety or panic attacks. (Tr. 701, 723). She also reported a history of suicidal ideation with attempts and self-harm, however there were no current suicidal ideations reported. (Tr. 702, 705). Horn's speech was often pressured and hyperverbal and her mood and affect were anxious. (Tr. 704, 726, 737, 749). She demonstrated poor concentration and attention span and was distractable. (*Id.*). Her thought process was racing and disorganized. (*Id.*). Horn demonstrated fair judgment with awareness of problem and acceptance of help. (Tr. 705).

### C. Medical Opinion Evidence

#### 1. Yolanda C. Leon, Psy.D. ABPdN Evaluation

As a minor, Horn presented for a learning disability evaluation by Yolanda C. Leon, Psy.D. ABPdN at Hope Counseling Centers on June 26, 2017, for the purposes of determining eligibility for Social Security benefits. (Tr. 586, 593). Horn's attitude during the assessment was noted as poor, but that she responded well to structure and prompting. (Tr. 586). At the time of the evaluation, Horn was prescribed Adderall and Vyvanse by her pediatrician. (*Id.*). Horn

reported diagnoses for ADHD and bipolar depression, however she had not been formally evaluated or diagnosed by a psychiatrist. (Tr. 587). Her mental health symptoms were characterized as unremarkable. (*Id.*). During the evaluation, Horn demonstrated relatively normal attention and concentration and was able to attend to the evaluator's questions without distraction. (Tr. 588). During testing, Horn expressed a need for a fidget device and when told she could not use it during the standardized testing, the examiner noted that Horn was shocked and expressed disbelief in this answer but was able to complete the testing without the device. (*Id.*). Horn displayed no significant difficulties in processing speed and her receptive language, immediate memory, and remote memory were good. (*Id.*). Horn displayed relatively normal social skills with good judgment related to self-care and social problem solving. (*Id.*). Her intelligence was approximated at above average with coherent, logical, and goal directed general thought processes and age-appropriate thought form and content. (*Id.*).

Dr. Leon administered the Wechsler Intelligence Scale for Children and Horn scored high average in verbal comprehension; low average in visual spatial, fluid reasoning, and full-scale IQ, and very low in working memory and processing speed. (Tr. 588-89). Dr. Leon summarized that Horn did not appear to meet criteria for a mental health diagnosis at the time of testing, and did not exhibit psychometric evidence of a learning disorder, but rather exhibited low motivation and appeared to utilize "'learning problems'" as an excuse to not complete her work. (Tr. 593). Dr. Leon opined that Horn appeared convinced she was impaired and did not have to engage in academic- or work-related tasks due to them being "too hard," and exhibited a dynamic of "'learned helplessness'" due to a perceived disability which was reinforced by her mother's perception of her. (*Id.*). Horn's prognosis was very good, particularly if she became involved

with ongoing behavior management with her mother actively involved in parenting skills and training. (*Id.*).

### 2.     Danna B. Costa-Sahs, Psy.D. Evaluation

As an adult, Horn presented for an evaluation by Danna B. Costa-Sahs, Psy.D. at Hope Counseling Centers on December 20, 2021, for the purposes of determining eligibility for Social Security benefits. (Tr. 517). During the evaluation, Horn was able to answer all questions but had difficulty giving specific information and dates. (*Id.*). Horn's attitude was positive throughout the evaluation with fair eye contact. (Tr. 518). She displayed adequate cooperation and effort, but her behavior was remarkable for fidgeting and talkativeness. (*Id.*). At times, she required redirection. (*Id.*). Horn reported a head injury in 2019 while playing basketball and was currently prescribed Vyvanse, Adderall, and Ibuprofen. (*Id.*). She also reported having diagnoses of ADHD, bipolar disorder, and anxiety. (*Id.*). Horn had engaged in outpatient treatment and counseling in the past, but her present conditions were impacted by financial issues and her relationship with her mother. (*Id.*). Horn's reported mood was "'in between okay and happy'" with the appearance of restricted affect, she also reported problems sleeping, fatigue, worry, irritability, restlessness, ruminations, and feelings of worthlessness and hopelessness. (*Id.*). She experienced these symptoms every day and they began between the ages of 10 and 12. (*Id.*). Dr. Costa-Sahs reported the symptoms as mild to moderate. (*Id.*).

Horn explained her typical day consisting of going to school, playing video games, and walking her dog. (*Id.*). She was able to bathe, dress, toilet, get around the house, and care for her dog independently but could not independently manage finances, pay bills on time, complete grocery shopping, or use public transportation. (*Id.*). Horn relied on her mother, walking, or riding her bike for transportation. (*Id.*). Regarding school, Horn reported her behavior at school

8

being remarkable for poor attitude and problems focusing. (Tr. 519). Horn reported, similarly, to having issues focusing when she was previously employed at a fast-food restaurant. (*Id.*).

Dr. Costa-Sahs noted that Horn demonstrated good attention and concentration – with the ability to attend to questions without distraction. (*Id.*). Her mental flexibility appeared adequate, but she displayed difficulties in processing speed. (*Id.*). Horn's immediate, recent, and remote memory appeared adequate. (*Id.*). She displayed fair social skills with adequate judgment related to self-care and social problem solving. (*Id.*). Dr. Costa-Sahs' diagnostic impressions included unspecified anxiety disorder, unspecified depressive disorder, unspecified ADHD, and unspecified disruptive, impulse-control, and conduct disorder (by history). (Tr. 520). According to Dr. Costa-Sahs, Horn's presentation appeared consistent with most reported conditions except she did not believe she met the criteria for bipolar disorder. (*Id.*). Horn's mental health symptoms appeared to mildly to moderately impact her activities of daily living, academic performance, and interpersonal interactions. (*Id.*).

### 3.     Rachel M. Undercoffer, Ed.S., NCSP, BCCS, SP Evaluation

On October 24, 2023, Horn presented for an evaluation with Rachel M. Undercoffer, Ed.S., NCSP, BCCS, SP to assist with accessing community-based services and resources. (Tr. 852). At the evaluation, Horn endorsed a need for space around her due to fear, anxiety, and stress when people are too close, sensory needs, struggles with authority figures, trouble looking at people when uncomfortable, difficulties going into public due to irrational fear and symptoms, and hyper fixation. (Tr. 856). She uses earbuds, listening to music, movement breaks, space and a calm atmosphere, fidget items, chewelry items, watching television, keeping hands busy, and shaking her legs or hands as tools and supports. (*Id.*). Ms. Undercoffer noted the following observed behaviors during the evaluation: obsessive compulsive behaviors, repetitive thinking

and looping conversations, social communication difficulties, verbal, facial, and motor tics during stress or anxiety, sensory regulation difficulties, easy distractions, inattentiveness, and fidgeting, social immaturity, difficulties with daily hygiene, and challenges following along in conversation. (*Id.*).

Ms. Undercoffer administered the Woodcock Johnson Test of Cognitive Abilities, Fourth Edition (WJ-IV). (*Id.*). Horn scored "low" for number series and verbal attention, "low average" for general intellectual ability and visualization, and "average" for oral vocabulary, letter-pattern matching, phonological processing, and story recall. (Tr. 857). During testing, Horn displayed the need for additional wait time when responding to some testing items, clarifications of what the directions were asking, and the ability to have repetition of information as allowed for directions. (*Id.*).

Horn was also administered the Woodcock Johnson Tests of Achievement, Fourth Edition (WJ-IV); Form B. (Tr. 857-58). On that test, Horn scored "very low" in letter-word identification in both reading and brief achievement, "low average" in passage comprehension and applied problems, and "average" in spelling. (Tr. 858).

Ms. Undercoffer found that Horn's diagnoses, by history, included ADHD, major depressive disorder, PTSD, generalized anxiety disorder bipolar disorder, and autism spectrum disorder. (Tr. 865). Horn exhibited a pattern of strengths and weaknesses in her cognitive skills which affected her ability to take on new learning, problem solve appropriately, work efficiently, and make connections between concepts easily. (Tr. 864-65). In Ms. Undercoffer's opinion, Horn experienced a variety of symptoms from her numerous diagnoses on a daily basis that affected her ability to complete her education, as well as hold part-time employment as she struggled in the job setting with her mood, behavior, communication, social skills, and trauma

10

responses. (Tr. 865). Regarding employment, Ms. Undercoffer recommended based upon observations, results in assessments, and history Horn would require:

> various accommodations on the job site and she will need potential assistance working with her employers to figure out the best ones that are practical and feasible to be implemented. She may need supports such as additional breaks throughout her work shift; visual supports to accompany auditory instructions or procedures; a safe, quiet place to go when she needs to decompress; ability to wear earbuds as needed to prevent sensory overload; and frequent check-ins from another adult to help her with questions or clarification.

(Tr. 866).

###           4.        Mackenzie Ice, CNP Mental RFC Evaluation

In November 2023, CNP Ice, completed an assessment of mental ability to sustain work related activities. (Tr. 867-70). In that assessment, CNP Ice opined that Horn had the ability to understand and remember very short and simple instructions, carry out short and simple instructions, work in coordination with or in proximity to others without being unduly distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and maintain attention and concentration for extended periods (approximately two-hour segments between arrival; and first break, lunch, second break, and departure) 70 percent of the eight-hour workday. (Tr. 867-68). For 60 percent of the eight-hour workday, Horn had the ability to sustain an ordinary routine without special supervision and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 867). CNP Ice stated that Horn had the limitation of being distracted by others and a need to fidget or move around. (Tr. 868). Regarding responding appropriately to supervision, co-workers, and usual work situation, CNP Ice opined that Horn retained the ability to interact appropriately with the general public and to maintain socially appropriate behavior 70 percent of the eight-hour workday and could accept instructions and to respond appropriately to criticism from supervisors and get along with co-workers or peers 60 percent of the eight-hour workday. (*Id.*). Horn's

limitation in this category were described as inappropriate responses to social situations, but she could interact with others appropriately most of the time. (*Id.*).

In adaptations, Horn had the ability to respond appropriately to changes in work setting and to deal with ordinary work stress 70 percent of the eight-hour workday. (*Id.*). However, Horn may be unable to handle stress at times. (Tr. 869). Horn would be absent from work approximately twice per month as a result of her impairments. (*Id.*).

Horn's diagnoses included major depressive disorder, recurrent, moderate, ADHD, combined type, PTSD, generalized anxiety disorder, and autism spectrum disorder (provisional/rule-out). (*Id.*). In CNP Ice's opinion, Horn's impairments had lasted or could be expected to last 12 continuous months or longer and had persisted with the restrictions as outlined since May 22, 2023. (*Id.*). Horn reported that her medication helped her ability to function. (*Id.*).

### 5.      State Agency Reviewers

On January 6, 2022, state agency reviewing psychologist George Grubbs, Psy.D., reviewed Horn's file at the initial level. (Tr. 83-87). He opined that Horn had no limitations in understanding, remembering, or applying information and adapting and managing oneself, but that she had moderate limitations in interacting with others and concentrating, persisting, or maintaining pace. (Tr. 86). Dr. Grubbs found that Horn's impairments included ADHD, and anxiety and obsessive-compulsive disorders, but that these impairments were non-severe. (Tr. 85).

On May 13, 2022, state agency reviewing psychologist Frances Martinez, Ph.D., reviewed Horn's file at the reconsideration level. (Tr. 90-93). Dr. Martinez found that Horn's impairments included ADHD, and anxiety and obsessive-compulsive disorders, but that these

impairments were severe. (Tr. 90). Dr. Marinez further found that Horn had mild limitations in understanding, remembering, or applying information, interacting with others, and adapting and managing oneself, and had moderate limitations in concentrating, persisting, or maintaining pace. (Tr. 91). Additionally, Horn would be moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods, but that's she would not be significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them make simple work-related decisions, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 93).

### D.    Relevant School Evidence

A 2018 Behavior Intervention Plan stated Horn's primary diagnosis was ADHD. (Tr. 624). It also specified that Horn's teachers noticed a change in her behavior from the previous year, noting that she refused to stay in one area and finds it difficult to be responsible for her actions. (*Id.*). The behavior was noticed when she was off of her medication. (*Id.*).

School records from Pasco County contain a manifestation determination meeting record that indicates on March 6, 2019, Horn had an incident on the bus where she refused to go to her assigned seat, gestured at motorists, used extreme language, and threatened to get the driver in trouble with her mother. (Tr. 608). This was part of a pattern of behavior which resulted in 12 referrals, nine days out of school suspension, and five days of bus suspensions. (*Id.*).

In the student input form for her 2019 Individual Educational Plan ("IEP"), Horn stated her strengths were her ability to calm down and being very smart. (Tr. 615). Her areas of concern were being followed by her teachers when she was upset. (*Id.*). Horn's goal was to attend a local community college or technical school after graduation. (*Id.*). Her instructors noted that she was a polite and well-liked student who needs reminders to stay focused on academics when distracted by peers or social media. (*Id.*). Horn's specially designed instruction included: specialized instruction in reading, writing, and math, instruction in self-advocacy and determination skills, and behavior support in problem solving and decision making. (Tr. 619). Horn also received transportation services, social work, counseling, and behavioral specialist eservices. (Tr. 620).  Horn received the following accommodations: repeated/clarified directions, verbal encouragement, extended time on assignments and assessments, small group test and assignment administrations, increased opportunity for movement, and preferential seating. (Tr. 620-21). Her IEP also specified that she would be inside the regular classroom less than 40% of the day. (Tr. 621-22).

A 2019 IEP from Oberlin Schools states Horn wore glasses and had an ADHD diagnosis. (Tr. 648). Horn took medication in the past but had not for the last several months to encourage herself to manage without the medication. (*Id.*). Horn received extended time for tests as an accommodation. (Tr. 650). Horn was also permitted to carry a water bottle with her. (Tr. 651). This IEP was amended on February 26, 2020 to implement speech-to-text as an accommodation. (Tr. 652). Due to behavioral concerns from previous incidents on the school bus, Horn rode in a school van for transportation. (Tr. 668).

Oberlin School records demonstrate that Horn was disciplined 13 times between September 25, 2019 and February 21, 2020. (Tr. 641). Reasons for Horn's discipline included

14

insubordination, obscene language, leaving without permission, general misconduct, manifest

disrespect, tardiness, disruption, and failure to serve. (*Id.*). Horn was absent 42 times during the

2019-2020 school year. (Tr. 644-45).

Horn's September 22, 2020 IEP notes that she had recently been suspended from school

due to her behavior. (Tr. 595). She was switched from being a campus student to an online

student. (*Id.*). The IEP team suggested that Horn have supports in geometry due her recent

struggles, however Horn and her mother refused the supports. (*Id.*). Horn's mother also

expressed that she did not want mental health services for Horn at that time. (*Id.*). Horn's IEP

listed the following accommodations: extended time for assignments and tests, small group

setting for reinforcements and tests; oral presentation for FSA, directions, instructions, test times,

or answer choices; and repeated, summarized, or clarified directions. (Tr. 604-05). Horn was also

permitted a cooling off period when anxious and frustrated. (Tr. 595).

The IEP notes that Horn admitted to being combative and having trouble following class

rules, which was evidenced by her daily infractions with the dean of discipline. (Tr. 596).

Further, Horn improved her communication with her consultant teacher resulting in few to no

incidents of distraction. (*Id.*). As part of her IEP review, Horn was interviewed and expressed an

interest in art, makeup, and music. (*Id.*). She was interested in being the first of her siblings to go

to college and wished to attend college out of state. (Tr. 596-97). She wanted to become a

mechanic or an artist. (Tr. 596). Horn's mother expressed concerns that Horn was struggling

with online classes but requested that Horn's IEP have the same services as her transfer IEP. The

IEP team noted that Horn's behavior does not impede her learning or the learning of others and

that she did not have any communication needs at that time. (Tr. 597). Horn's needs were listed

as asking questions and seeking help when usure of tasks and narrowing down interests after

15

graduation. (*Id.*). Her strengths included communication, reading, and taking criticism in a positive way – however, she also needs to advocate for a cooling off period when anxious and frustrated. (Tr. 598).

Horn's 2023 504 Plan from Oberlin Schools lists her impairments as generalized anxiety disorder, ADHD, major depressive disorder, posttraumatic stress disorder, bipolar disorder, and autism spectrum disorder. (Tr. 634). These impairments affected her ability to concentrate, think, and work at school. (*Id.*). As a result, Horn received the following accommodations: extended time on assignments, tests, and quizzes; small group setting for tests and quizzes; clarification of directions; the ability to use headphones to listen to music with teacher permission; use of fidgets during class; ability to wear a hat or head covering with teacher permission; and the ability to keep her backpack near her in classroom with teacher permission. (Tr. 635).

Horn's first quarter report card for the 2023-2024 school year indicates that she had been absent a total of 17.5 days and tardy nine days. (Tr. 638). Her report card also demonstrates that she was receiving an "F" and noted as "withdrawn" in all of her coursework with the exception of her American Sign Language course, for which was receiving an "A+." (*Id.*). Discipline records also show that Horn was disciplined for insubordination on September 15, 2023 for refusing to flip her phone over during class. (Tr. 641).

### E.    Administrative Hearing Evidence

Horn testified that she received some special education services in school. (Tr. 47). At times she received one-on-one help in the classroom, got extra time on tests, or had the test questions read to her. (Tr. 47-48). Most of the time she had instructions and directions read to her in order for her to understand them. (Tr. 48). She was permitted to use fidget toys, read aloud, and listen to music during class. (*Id.*). Her school records indicate that she missed school

approximately once or twice a week because she felt anxious about having to communicate and interact with people and it overwhelmed her brain. (Tr. 48-49). Horn would get in trouble at school because she found it difficult to focus on her schoolwork. (Tr. 46-47). She had trouble with the directions given to her by teachers. (Tr. 47). She did not talk to the other students at school because she did not get along with them and felt there was too much going on to try. (*Id.*).

She claimed that her behaviors like walking out of the classroom and arguing with teachers were present in the workplace as well. (Tr. 47). At the time of the hearing, Horn had worked a part-time job at a fast-food restaurant for two or three months. (Tr. 49-50). Her position was directed at the back cash window. (Tr. 49). Her job duty was taking orders before customers drove to her window. (*Id.*). This position did not require a lot of interaction with coworkers but did require interaction with customers. (*Id.*). She did not receive any accommodations in this position but was allowed to wear a headset and have her fidgets with her. (Tr. 50). Horn stated that at times her job duties became too much for her to handle. (*Id.*). As a result, there were times when she walked away from her duties. (*Id.*). She called off six times because she could not handle it that day. (*Id.*).

When Horn started working at the fast-food restaurant, she worked approximately three days per week, however at the time of the hearing she was down to working seven or eight hours per week in four-hour shifts. (Tr. 51-52). She was not sure why her hours had been cut, but recalled they were cut after she went for a mental health evaluation because she missed a shift. (Tr. 51).

Asked how her relationship is with her supervisors, Horn said they do not get along. (*Id.*). She will not pay attention to a supervisor when corrected or yelled at by them because she does not think that is proper to do with a customer at the counter. (*Id.*).

When the restaurant gets busy, Horn explained feeling alone and like "a bunch of trains [are] derailing" in her brain. (Tr. 52). When this happens, she asks for help, people do not help fast enough, or they make her nervous. (*Id.*). She felt as though she was doing the best she could. (*Id.*).

Horn felt as though she asked for breaks more often than her coworkers when work becomes too much for her to handle. (*Id.*). When that happens, she asks to go to the cafeteria for 30 minutes. (*Id.*). Her supervisors often let her take the break, but many times the request is too unreasonable to allow it. (*Id.*).

Prior to this job, Horn worked at a different fast-food restaurant for approximately one month. (Tr. 52-53). Horn had trouble at this job and had times where she walked off. (Tr. 53). She called off from work every other shift. (*Id.*). Within one week of working there, her hours were reduced. (*Id.*). This job ended with her quitting. (*Id.*).

Horn did not get along with her supervisors at this job either. (*Id.*). When the restaurant became too busy, Horn at times had panic attacks because there was too much going on. (Tr. 54). Asked what a panic attack at work looks like, Horn responded "I kind of don't even do that around anyone else, I just try to focus on one thing at a time or as much as I can at a time." (*Id.*). Horn also asked for more breaks than her coworkers in this job. (*Id.*).

Prior to this job, Horn worked at her first job at a fast-food restaurant. (*Id.*). Horn's job duties were working the counter, bagging food, and the closing shift. (*Id.*). Horn recalled having a few panic attacks at this job as well. (Tr. 55). Like her other jobs, Horn would at times walk out from her shifts at this restaurant. (*Id.*). Regarding attendance, Horn stated that she would go in for her shifts "super late" and at times would call off because it was too late to go in. (*Id.*). She

18

did not get along with her supervisors in this position. (*Id.*). Horn worked in this position for approximately one or two months before she quit. (*Id.*).

Regarding her daily activities, Horn stated that she takes medications and only sometimes remembers to take them as directed. (Tr. 56). Otherwise, she relies on her mother to remind her to take them. (*Id.*). Her mother also has to remind her to bathe, do the dishes, and laundry. (*Id.*). Horn is familiar with her mental health diagnoses based on what her mother has told her; those diagnoses are ADHD, bipolar, anxiety, depression. (*Id.*). She sees a doctor and counselor to treat these. (*Id.*).

Next, the VE testified. (Tr. 57). According to the VE, a hypothetical individual of Horn's same age, education, and work experience, with no exertional limits, but that was limited to understanding, remembering, and carrying out and performing simple, routine tasks and instructions, reasoning level one or two; occasional interactions with the public, coworkers, and supervisors, and occasional changes in work setting, with no past relevant work could perform the medium level jobs of dishwasher, SVP 2, DOT 318.687-010, with approximately 102,000 jobs in the national economy; machine packager, SVP 2, DOT 920.685-068, with approximately 90,000 jobs in the national economy, and motor vehicle assembler, SVP 2, DOT 806.687-010, with approximately 191,000 jobs in the national economy. (Tr. 58).

If that hypothetical individual was further limited to require two unexcused absences per month, this limitation would be work preclusive. (*Id.*). If this hypothetical individual had a hard time getting along and argues with supervisors, could not meet productivity requirements due to not understanding the direction, needed directions repeated and clarified multiple times, walks away without permission due to frustration and distraction, and needed extra time to compose assignments, that individual would not be able to perform the jobs identified. (Tr. 59).

19

The VE testified that her testimony and opinions are based on and consistent with the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of the DOT. (*Id.*). She also reads economy business patterns and labor market projections and uses Job browser pro for the job numbers. (*Id.*).

## IV.    The ALJ's Decision

1.    The claimant attained age 18 on June 8, 2021, and was eligible for supplemental security income benefits as a child for the month preceding the month in which she attained age 18. The claimant was notified that she was found no longer disabled as of January 5, 2022, based on a redetermination of disability under the rules for adults who file new applications.

2.    Since January 5, 2022, the claimant has had the following severe impairments: major depressive disorder; anxiety disorder; attention deficit hyperactivity disorder (ADHD); post-traumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3.    Since January 5, 2022, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    Since January 5, 2022, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant would be limited to understanding, remembering, carrying out, and performing simple routine tasks and instruction, reasoning level 1 or 2; occasional interaction with the public, co-workers, and supervisors; and only occasional changes in work setting.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on June 9, 2003 and is a younger individual age 18-49 (20 CFR 416.963).

7.    The claimant has a limited education (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Since January 5, 2022, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant's disability ended on January 5, 2022, and the claimant has not become disabled again since that date (20 CFR 416.987(e) and 416.920(g)).

(Tr. 19-34).

## V.    Law & Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;

2.    if not, whether the claimant has a severe impairment or combination of impairments;

3.    if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.    if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.    if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[2]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

---

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not

22

uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

**VI.    Discussion**

Horn raises the following issue for this Court's review: "The Residual Functional Capacity was not supported by substantial evidence because the ALJ failed to comply with the legal requirements of both SSRs 96-8p and 85-16 when he evaluated the limiting effects of Rayne's mental impairments on her ability to perform work-like activity." (ECF Doc. 8, p. 16). Notwithstanding the fact that Horn raises this as her sole error for review, within the body of her argument she raises multiple other issues with respect to the ALJ's fashioning of the RFC, including failure to explain his rationale pursuant to SSR 11-2p (*id.* at p. 18; *see also* ECF Doc 11, p. 6), failure to employ the requisite analysis required under SSR 85-15 (ECF Doc. 8, p. 19), and the failure build an accurate and logical bridge between the RFC and the evidence in the record (*id.* at pp. 21-22). The commissioner responds addressing the RFC as a whole and asserts that the substantial evidence supports the RFC and that Horn's arguments to the contrary amount to a request to reweigh the evidence and reach a different conclusion. (ECF Doc. 10, pp. 9-16). Below, I address each argument in turn and find no reversible error.

### A.    SSR 96-8p

With respect to SSR 96-8p, Horn argues that the "RFC did not encompass all of [her] functional limitations and was not based on the record as a whole." (ECF Doc. 8, p. 18). She argues that she had previously been found disabled because she met the listing requirements of 111.12 for her ADHD diagnosis and "[t]here was no evidence that the ADHD improved albeit her depression was less severe because of medication" and that the only thing that had changed, in her view, was her turning 18years old. (*Id.*). According to Horn, "the ALJ failed to explain how he considered all of [her] limitations when he determined [she] had the ability to function independently, appropriately and effectively 8-hours a day – ongoingly – in a full-time job as required by SSR 96-8p." (*Id.* at 19).

SSR 96-8p provides that "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." In making this determination, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Id.*

Here, the ALJ found that Horn had the following severe impairments: major depressive disorder, anxiety disorder, ADHD, and PTSD. (Tr. 19). He found Horn's non-severe impairments included headaches, nausea/gastritis, clinical obesity, and vision problems. (Tr. 20). Further he found that "the objective evidence does not currently support ODD, autism spectrum disorder, or bipolar disorder as medically determinable mental impairments." (*Id.*). Notwithstanding his finding that these impairments were not medically determinable, the ALJ noted that he "considered all of the claimant's mental symptoms under [these diagnoses] in evaluating her functioning and in assessing her residual functional capacity." (*Id.*). Horn does not raise error with respect to these findings.

In crafting the RFC, the ALJ considered Horn's

> combined mental symptoms, including her difficulties with focus and
> attention, mood instability, social anxiety, and tendency to be easily
> overwhelmed under stress, moderately limit her ability to learn, recall, and
> use information in the performance of work activities, as well as her ability
> to focus attention on work activities and stay on task at a sustained rate.
> **Even so, the evidence as a whole shows she has adequate cognitive
> function and mental stability to understand, remember, carry out, and
> perform simple, routine tasks and instruction, with a reasoning level of
> one or two.** Because of her social anxiety, mood fluctuations, and difficulty
> getting along with others and following instruction when overwhelmed, she
> is further limited to jobs requiring no more than occasional interaction with
> the public, co-workers, and supervisors. To further limit the likelihood of
> work-related stressors causing an increase in her mental health symptoms
> as well as to address her baseline difficulties with attention and
> concentration, she is further limited to jobs with only occasional changes in
> the work setting.

(emphasis added) (Tr. 30). The ALJ made this finding after approximately seven pages of

analysis on Horn's medical and school records. (*See* Tr. 23-30). I find, contrary to Horn's

assertion, that the ALJ's analysis did assess the RFC based upon the record as a whole, giving

consideration to all of Horn's functional limitations. The ALJ adequately explained how he

determined that Horn had the ability to function independently, appropriately and effectively 8-

hours a day on an ongoing basis. For these reasons, I find no error in this argument and

recommend that the District Court affirm the ALJ's decision.

**B.      SSR 11-2p**

Next, Horn argues the ALJ erred by failing to properly discuss her school records and

accommodative learning pursuant to SSR 11-2p. According to Horn, SSR 11-2p required the

ALJ to "discuss how her participation in the highly structured or supportive settings in school

impacted [his] decision regarding the adult RFC." (ECF Doc. 10, p. 16). She further argues that

"[i]t appears the ALJ concluded that the accommodations were not the type that would impact

work capabilities such that a VE would need to consider them in connection with the RFC

assessment." (*Id.* at pp. 16-17). This failure to discuss accommodative learning was reversible error in Horn's view. (*Id.* at 17).

SSR 11-2p provides guidance on how an ALJ should evaluate disability in young adults. SSR 11-2p, *Documenting and evaluating disability in young adults*, 2011 WL 4055665 (Sept. 12, 2011). The Ruling defines young adults as "people between the ages of 18 to approximately 25." *Id.* at \*2. In relevant part, SSR 11-2p provides that a claimant's school records "may indicate how well a young adult can use his or her physical or mental abilities to perform work activities." *Id.* at \*14. The Ruling instructs ALJs to take into account evidence from a variety of sources for the disability evaluation, including: (i) medical sources; (ii) school programs, including special education and IEP; (iii) psychosocial supports and highly structured or supportive settings; and (iv) extra help and accommodations. *Id.* at \*9-20. SSRs do not have the force of law but are binding on ALJs. *See Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010) ("Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." quoting 20 C.F.R. § 402.35(b)(1))).

Upon review of the ALJ's RFC analysis, I find no error with respect to SSR 11-2p. In discussing his RFC determination, the ALJ disused in relevant part as follows:

> The claimant's school records reflect she has received Exceptional Student Education (ESE) services and accommodations under an Individual Education Plan (IEP) both in Florida and Ohio for many years in the areas of communication, curriculum and learning environment, independent functioning, and social/emotional behaviors. These records note a history of behavioral difficulties, including defiance, not following school expectations, and not completing work in a timely manner with accommodations including placement in a self-contained classroom since elementary school. (e.g., Exhibits 1E, 8E, 6F, 7F) Her IEP for the 2020-2021 school year in Florida reflects the claimant had continued behavioral problems with focusing on her school work without distraction and

insubordination, particularly with respect to following instruction without becoming argumentative or combative, resulting in her suspension early in the school year before she was enrolled in eLearning versus continued face-to-face learning. In addition to accommodations for assignments and testing, she was also to receive behavioral supports and special education in mathematics and reading, within the regular education classroom setting. (Exhibit 6F).

. . .

The claimant returned to the twelfth grade in Ohio for the 2023-2024 school year. At a 504 Plan meeting in September 2023, the claimant's mental symptoms were noted to affect her ability to concentrate, think, and work at school. Specifically, the claimant was unable to focus as she was easily distracted and anxious. Her anxiety could increase and lead to her becoming more hyperactive. She took comfort in creating a safe personal space for thinking and concentrating at school and engaged in self-soothing and emotional regulation with music, fidget toys, and head coverings. She was afforded accommodations included extended time for assignments, tests, and quizzes; ability to take tests and quizzes in a small group setting; clarification of directions; allowance to use headphones and fidget toys and to wear a hat or head covering in class. By the end of October 2023, the claimant had already incurred a number of tardies and unexcused absences and one disciplinary action in September 2023 for insubordination related to using her phone in class. The claimant's report card as of the end of the first quarter of the 2023-2024 school year reflect she had an A+ in American sign language and had withdrawn from all other courses with grades of Fs. (Exhibit 7F)

. . .

The statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are partially consistent with the medical evidence and other evidence in the record. The medical evidence of record and the **claimant's school records do reflect various mental diagnoses with symptoms that are partially controlled with medication**. The claimant's most recent treatment records from The Nord Center from 2023 reflect improvement in her mood symptoms and anxiety with medication; however, she has continued to have difficulties with maintaining attention and concentration and with responding to stressors without becoming overwhelmed to the point of shutting down or exhibiting insubordination or inappropriate behavior, which is generally consistent with her testimony at the hearing. (Exhibit 8F) **While there is evidence of some academic deficits, her intellectual functioning is in the low average range**. (e.g., Exhibit 9F) **While her school records note she has behavioral difficulties including insubordination toward teachers which have resulted in disciplinary actions, her behavior seems to occur when responding to stress or overstimulation, which is consistent with her testimony that she tends to tune out her supervisors when she is busy or anxious in her current part-time position at McDonalds.** (Exhibits 6F, 7F, Hearing testimony) Even though she often requires reminders or

27

nudging to complete basic age-appropriate tasks (e.g., Exhibit 31E, Hearing testimony), such as taking her medication and maintaining her personal hygiene, she is generally independent in performing these tasks and has a variety of interests and hobbies she is able to engage in. (e.g., Exhibits 13E, 2F, 8F, 9F, Hearing testimony) Her combined mental symptoms, including her difficulties with focus and attention, mood instability, social anxiety, and tendency to be easily overwhelmed under stress, moderately limit her ability to learn, recall, and use information in the performance of work activities, as well as her ability to focus attention on work activities and stay on task at a sustained rate. Even so, **the evidence as a whole shows she has adequate cognitive function and mental stability to understand, remember, carry out, and perform simple, routine tasks and instruction, with a reasoning level of one or two. Because of her social anxiety, mood fluctuations, and difficulty getting along with others and following instruction when overwhelmed, she is further limited to jobs requiring no more than occasional interaction with the public, co-workers, and supervisors. To further limit the likelihood of work related stressors causing an increase in her mental health symptoms as well as to address her baseline difficulties with attention and concentration, she is further limited to jobs with only occasional changes in the work setting.**

(emphasis added) (Tr. 25, 28-29).

This portion of the RFC analysis makes abundantly clear that the ALJ considered Horn's school records including her IEP, 504 plan, and resulting accommodations when crafting the RFC. This discussion spanned serval pages and allows this Court to meaningfully review how the ALJ considered Horn's school records and accommodations in relation to the RFC determination. While Horn may have preferred the ALJ to have considered this evidence differently and arrive at another conclusion, no error can be found in the ALJ's articulation of how he considered the evidence.

### C.    Accurate and logical bridge

Finally, Horn states that the ALJ should have given consideration to her quality of daily activities, ability to sustain activities, and ability to function in a work-like situation pursuant to SSR 85-16's mandate "to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses" with respect to mental impairments. (EFC Doc. 8, p.

17). Upon review of the argument, I do not find that she meaningfully crafted an argument related to SSR 85-16, rather she merely references and makes generic claims with respect to it. I therefore find her arguments with respect to SSR 85-16 waived and do not discuss her argument with respect to this Ruling.

Horn ties these assertions to her argument that SSR 85-15 was applicable to her but "the ALJ failed to do the requisite analysis . . . in her case." (ECF Doc. 8, p. 19).

SSR 85-15 defines the difference between "exertional" and "nonexertional" impairments. An "exertional limitation," incorporated into SSR 85-15 from SSR 85-10, is "[a]n impairment-caused limitation which affects [a person's] capability to perform an exertional activity. SSR 85-10. An "exertional activity is defined as "[o]ne of the primary strength activities (sitting, standing, walking, lifting, carrying, pushing, and pulling) defining a level of work." *Id.* A "nonexertional limitation," on the other hand" is "one which is medically determinable and causes a nonexertional limitation of function . . . [which] may or may not affect a person's capacity to carry out the primary strength requirements of jobs, and they may or may not significantly narrow the range of work a person can do." SSR 85-15.

I agree with Horn that SSR 85-15 is applicable to her because the RFC only includes non-exertional limitations, however I disagree that reversible error exists with relation to the ALJ's decision. See *Morales v. Comm'r of Soc. Sec.*, 2022 WL 2948788, at *3 (N.D. Ohio, July 26, 2022 finding SSR 85-15 applicable only to solely nonexertional limitations and holding that it "merely helps provide a framework for evaluation on non-exertional limitations"). Here, the ALJ properly evaluated Horn's nonexertional limitations, he reviewed the entirety of the record and provided evidence that was adequate to support the RFC determination. The ALJ's RFC determination spanned approximately 10 pages and went into detail on his findings with respect

to each medical record and opinion, and how those formed his opinion on Horn's nonexertional limitations. (*See generally* Tr. 23-33). Accordingly, I cannot recommend remand on the basis of the ALJ's application of SSR 85-15.

While Horn argues that the ALJ erred by failing to comply with SSRs 85-15 and 85-16, my review of the arguments reveal that they may be intended as more of a catchall argument with respect to the RFC and her allegations that the ALJ failed to build an accurate and logical bridge between it and the evidence. (ECF Doc. 10, pp 17, 21-22). Horn concludes her argument section with an assertion that the "RFC findings are also not supported by substantial evidence because it does not account for [her] specific limitations in concentration, persistence or pace" and further failed to account from her absences from work. (*Id.* at pp. 21-22).

First, Horn argues that the ALJ did not account for her limitations in concentration, persistence, or pace – I find no support for this argument upon review of the ALJ decision. In fact, the ALJ states:

> While the undersigned agrees the claimant has moderate limitations in concentrating, persisting, or maintaining pace, the undersigned finds these limitations are appropriately addressed in limiting the claimant to simple, routine tasks in an environment with limited social interaction and only occasional changes in the work setting; rather than broadly allowing the claimant to perform simple and moderately complex work tasks at a non-production pace. The undersigned finds the above residual functional capacity adequately addresses the claimant's difficulties with attention and concentration as well as in her ability to maintain well-being under stress.

(Tr. 32). The ALJ explicitly accounted for Horn's limitations with respect to concentration, persistence or pace, and explained that those limitations were addressed by limiting her to simple, routine tasks in an environment with limited social interaction and only occasional changes in the work setting. Therefore, Horn's assertion that the ALJ failed to account for those respective limitations is without merit.

30

Finally, with respect to the Horn's assertion that the RFC failed to account for her absences from work, the ALJ specifically acknowledged the opinion of CNP Ice that Horn would be absent about twice per month. (Tr. 31). After doing so, the ALJ concluded that this opinion was unpersuasive. (*Id.*). The ALJ stated that the form, which is one not created by the Social Security Administration, "uses a rating scale that is inconsistent with the Agency's methods for evaluating the severity of impairments." (*Id.*). He further concludes that CNP Ice's opinions regarding Horn's abilities in the workplace were inconsistent and not supported by the medical evidence and "not entirely consistent with [Horn's] performance of part-time work, admittedly with some difficulties when under stress or feeling overwhelmed." (Tr. 32). This discussion allows a subsequent reviewer to determine how the ALJ reached his decision and builds an accurate and logical bridge between the record and the decision. I therefore do not recommend remand on this basis.

**VII.    Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Horn's application for SSI be affirmed.

Dated: November 20, 2025

Reuben J. Sheperd
United States Magistrate Judge

_____

31

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).